## ALL CHILDREN'S HOSPITAL v HOSPITAL COST CONTAINMENT BOARD

Case No. 87-4988H

State of Florida, Division of Administrative Hearings

February 17, 1988

### APPEARANCES OF COUNSEL

**James M. Barclay** for petitioner.

**Gary Walker** for respondent.

### OPINION OF THE COURT

WILLIAM C. SHERRILL, JR., Hearing Officer.

### RECOMMENDED ORDER

The formal administrative hearing in this case was held before William C. Sherrill, Jr., in Tallahassee, Florida, on December 11, 1987.

The Petitioner presented exhibits A through R, except Q, which were admitted into evidence, and the testimony of Wanda N. Johnson,

Harold E. Fulmer, and Michael C. Poland. The Respondent presented exhibits 1, 4, and 5, which were admitted into evidence, and the testimony of William Summers and James Bracher. The parties filed a stipulation which is Hearing Officer's Exhibit 1. There is a transcript. The parties filed proposed findings of fact and conclusions of law.

The record stayed open until 5:00 P.M., December 15, 1987, to allow the Respondent an opportunity to review Petitioner's Exhibit R, and to determine if it needed to present additional evidence. T. 133. That time passed without a request to present additional evidence, and the record is now closed.

The issues involved in this case were well-stated in the prehearing stipulation. Chapter 87-92, *Laws of Florida,* authorized the Department of Health and Rehabilitative Services (HRS) to distribute $69.5 million from the Public Medical Assistance Trust Fund to hospitals meeting certain criteria. The distribution was to be based upon actual data from fiscal year 1986 as reported to the Hospital Cost Containment Board. Pursuant to subsection (5) of section 12, chapter 87-92, hospitals were allowed to correct fiscal year 1986 data, subject to verification by independent certified auditors. Based upon this corrected data, the Hospital Cost Containment Board was required to recalculate the distribution due and certify the revised amounts to HRS in October, 1987. The Petitioner in this case, All Children's Hospital, reclassified certain amounts related to its regional perinatal intensive care center (RPICC) program. The Hospital Cost Containment Board denied the reclassification, and All Children's Hospital requested a formal administrative hearing. At stake for All Children's Hospital is an additional amount of distribution of $197.347.

References in this recommended order to Petitioner's exhibits will only include the page number provided by the Petitioner in the booklet of such exhibits.

### Findings of Fact

1. The Regional Perinatal Intensive Care Centers (RPICC) Program in Florida is a regionalized health care delivery system designed to deliver optimal medical care to high risk pregnant women and sick or low birth weight newborns. P. Ex. H., p. 24.

2. The RPICC program is a program for indigents. T. 101. Each patient must be individually qualified for the RPICC program as an indigent. T. 31. See P. Ex. P, pp. 261, 265, and 269.

3. All Children's Hospital is a 113 bed hospital located in St. Petersburg, Florida, which specializes in services to children. Fifty-five

**197**

percent of the beds are intensive care beds qualified as intensive care beds by Social Security and Medicare definitions, and of these, 40 beds are neonatal nursery beds involved in the RPICC program. T. 16-17.

4. All Children's Hospital has participated in the RPICC program since about 1981. T. 58.

5. Data from the Petitioner's fiscal year 1986 is the year relevant to this case. Hearing Officer's Ex. 1. Petitioner's fiscal year runs from October 1st to September 30th.

6. The Petitioner provided RPICC services in its fiscal year 1986 pursuant to contracts with HRS. Hearing Officer's Ex. 1; P. Exs. K and L. (References in this recommended order will be to the contract which is P. Ex. K, although the same provisions are present in P. Ex. L. T.27.)

7. RPICC patients served by the Petitioner during fiscal year 1986 were medically indigent. Hearing Officer's Ex. 1.

8. All Children's Hospital's total charges for fiscal year 1986 RPICC patients were $1,562,390. Hearing Officer's Ex. 1.

9. For fiscal year 1986, All Children's Hospital received $1,034,115 of RPICC grant funds. Hearing Officer's Ex. 1.

10. Thus, in fiscal year 1986, the Petitioner received only partial payment for RPICC sponsored patients' charges. The difference was $528,275. Moreover, this partial payment did not cover its costs. T. 39, 22.

11. Hospitals that participate in the RPICC program usually lose money on the program. T. 101; P. Ex. I, p. 128.

12. Hospitals regulated by the Hospital Cost Containment Board must annually file a fiscal year report of their actual fiscal experience. T. 109. That report includes an unaudited report prepared in accordance with the Florida Hospital Uniform Reporting System (FHURS), certified by the hospital, and a report by a certified public accountant. T. 109-110.

13. For fiscal year 1986, the Petitioner originally reported to the Hospital Cost Containment Board $3,804,574 as "contractual adjustments-other" on line 11 of Worksheet C-2, FHURS account 5940. R. Ex. 4; P. Ex. B, p. 6; T. 55. This amount originally contained the difference between charges and payments related to RPICC patients, an amount that was $528,275. T. 55.

14. This manner of reporting was the same as had been used by All Children's Hospital in each year since at least 1983. T. 59.

15. Reporting the RPICC differential as "contractual adjustment-other" was also consistent with the manner in which some other hosiptals have reported and classified their RPICC charges and funds. T. 84, 91. It is unclear from the record whether all hospitals having RPICC programs report in this way.

16. There is no evidence that the RPICC program changed in any material way in fiscal year 1986 from prior years.

17. By letter dated September 18, 1987, the Petitioner filed a correction to its fiscal year 1986 report, making the following changes to the manner in which it accounted for the RPICC program:

a. Charges related to RPICC program patients in the total amount of $1,562.390 were reclassified under "charity uncompensated-other," Worksheet C-2, line 13, FHURS account 5960. T. 56; P. Ex. B, p. 6; P. Ex. M, p. 254.

b. Funds received from the RPICC program in the total amount of $1,034,115 were reclassified under "restricted grants for indigent care," Worksheet C-2, line 14. FHURS account 5970. T. 56, P. Ex. B, p. 6; P. Ex. M, p. 254.

c. The difference between RPICC charges and amounts received, a total amount of $528,275, which had originally been contained in the category "contractual adjustments-other" was subtracted from that account, Worksheet C-2, line 11. P. Ex. B, p. 6; T. 55-56.

18. Account 5940, "contractual adjustments-other," of the FHURS manual, provides in part that:

These accounts must be used to report the differential (if any) between the amount, based on the hospital's *full* established rates of contractual *patients' charges* for hospital services which are rendered during the reporting period and are covered by the contract, and the *amount received* and to be received *from third-party agencies* in payment of such charges, including adjustments made at year end, *based upon cost reports* submitted.

. . . . . . . . . . .

In any instance in which the difference between the amount of a patients' [sic] bill and the payment received by the hospital from a third-party agency *is recoverable from the patient,* any resulting uncollected amounts should be reported in the appropriate bad debt *or uncompensated care* category and should not be reported in contractual adjustments. (E.S.)

19. Account 5960, "charity/uncompensated care-other," of the FHURS manual, provides in part that:

199

Account 5960 shall be used to report the differential between the *amount,* based on the hospital's full established rates, *of bills* for hospital services to charity/uncompensated care patients and the amounts to be received from patients or on behalf of patients *(including* amounts received from voluntary agencies or *government agencies* on behalf of *specific* indigent patients) in payment for such services. (E.S.)

Account 5960 further requires that the hospital have a verifiable process for determining indigency for each individual patient. Indigency is defined generally as a family income for the preceding 12 months less than 150% of the federal poverty guidelines. The instructions for account 5960 further provide that:

When the hospital receives *lump-sum grants* or subsidies *(rather than specific payments* for *individual* patient's bills) from governmental or voluntary agencies for the care of medically indigent patients, the amount of the lump-sum grant or subsidy must be reported under "Restricted Donations and Grants for Indigent Care." (Account 5970). (E.S.)

20. Account 5970, "Restricted Donations and Grants for Indigent Care," of the FHURS manual, provides:

This account is used to report voluntary and governmental agency *grants* or subsidies for the care of *non-specified* medically indigent patients during the current reporting period. (E.S.)

21. The corrected report was reviewed and approved by an independent certified public accountant. T. 57-58; P. Ex. B, p. 5.

22. The Hospital Cost Containment Board, through its staff, proposed to deny Petitioner's corrections by letter dated October 8, 1987.

23. The Petitioner's request for formal administrative hearing was filed with the Hospital Cost Containment Board on October 28,1987.

24. If the Hospital Cost Containment Board accepts the foregoing corrections, the October distribution to the Petitioner will be $459,196. A denial of the correction will reduce this by $197,347 since the original October distribution to the Petitioner was $261,849. T. 49-50, 52, 54; P. Exs. J, O, and R.

25. The single agency designated to administer the RPICC program is the Children's Medical Services (CMS) Program Office of the Department of Health and Rehabilitative Services. P. Ex. H., p. 31. The RPICC program is a government program. T. 31.

26. Persons eligible for RPICC services must be indigent, and the standards of indigency in the statute are basically the same as the

200

poverty standards used by the Hospital Cost Containment Board in FHURS account 5960. T. 28-29; see finding of fact 19. Each patient must individually qualify based upon these standards of poverty. T. 31.

27. The legislature specifically appropriates RPICC funds from the general revenue fund as "G/A" funds, which are "grant-in-aid" funds. T. 17-18; P. Ex. E, F, G. The statute establishing the program refers to the funds as "grants." See sections 383.17-383.19, Fla. Stat. (1987). HRS refers to these funds as grants or grants-in-aid. P. Ex. H, pp. 29, 30, 94. The RPICC program thus is a grant program. T. 97-98; P. Ex. L, p. 216.

28. The grants are administered by contractual agreements between HRS and health care providers. Sections 383.17, 383.18, 383.319(3), Fla. Stat. (1987); P. Ex. K.

29. These contractual agreements must provide "that parents or guardians of those patients who are financially eligible to participate in the RPICC program shall not be additionally charged for treatment and care which has been contracted for by the [Department of Health and Rehabilitative Services]." Section 383.18, Fla. Stat. (1987). Thus, no hospital bills may be sent to RPICC patients or to their guardians, and these persons may not be charged by the hospital. Hearing Officer's Ex. 1; P. Ex. H, p. 94, (section 9-2c).

30. Contracts for administration of RPICC grants do not have a fixed contract price, but provide instead a lump sum that is the maximum amount promised, to be paid according to the conditions of attachment 1 to the contract. P. Ex. K, p. 170. Attachment 1 further privdes that the "grant funds" specified in lump sum amount "will be disbursed and accounted for according to the approved RPICC neonatal care (NCG) payment system for hospital services . . . ." P. Ex. K, p. 174. The "payment schedule" requires submission by the hospital of the "expenditure report" which is the form at p. 193, P. Ex. K.

31. The RPICC program expenditure report depends upon a previously established system that classifies types of neonatal infants into groups having similar lengths of stay, similar weights, and similar medical problems. Each group, termed a neonatal care group (NCG), is then assigned a relative weight intended to project the amount of services that infants in the group may need relative to other groups. T. 24-25; P. Ex. N.

32. The RPICC program expenditure report also depends upon a "base rate" previously calculated by HRS.

33. As stated above, the form at p. 193, P. Ex. K, is used for billing

HRS for RPICC contractual payments. T. 34. If the hospital bills on a monthly basis, a pro rata share of the contract amount available for draw in that month is computed based upon the amount of funds left in the contract divided by the number of months left in the contract year. T. 23. This amount is entered on line 5 of the form, P. Ex. K. p. 193.

34. Line 6, which is called "Total Expenditures" on the form, is next computed by multiplying the NCG's times the base rate to derive a total of "entitlements." T. 44. The sicker the infant, the higher the entitlement. T. 45. It is inferred that these NCG's are the ones associated with the actual patients served during that month, although the record is silent on this point.

35. Under the contract, the hospital then may request and receive only the lesser of line 5 or line 6 on the form. P. Ex. K, p. 193. In fiscal year 1987, All Children's Hospital was able to qualify more of its neonatal patients under the Medicaid program than had been expected, and the services for these patients were thus covered by Medicaid instead of by the RPICC program. Payment of another source reduced entitlements on line 5. T. 132-133. Thus, in fiscal year 1987, All Children's Hospital received less than was shown in the aggregate on line 6 of the form. T. 37-38.

36. The amount calculated on line 6 of the form at p. 193, P. Ex. K, the "entitlements" amount, thus serves as a maximum limit on payment for that month. It also is a method of verifying the amount of services actually provided by the hospital in the billing period. T. 24. The purpose of this system is to ensure that the hospital continues to serve neonatal patients throughout the contract year, even though it might have provided enough service to such patients early in the year to have justified earlier withdrawal of the entire contract amount. T. 34-35. The contract expressly provides that the hospital *must* continue to serve neonatal patients regardless of the availability of funds. P. Ex. K. p. 172; T. 22-23.

37. Although it is inferred that the "entitlement" calculation on line 6 contains NCG's that relate to specific patients served in the billing period, the entitlement calculation only marks a general payment ceiling, and is not a basis for an individualized and specific payment for services to a specific patient. T. 131. The payment is a lump sum. T. 40.

38. The Department of Health and Rehabilitative Services has adopted a manual establishing policies for the RPICC program. P. Ex. H, p. 21. Distribution of RPICC funds is dependent upon documenta-

202

tion described in chapter 7 of the manual. P. Ex. H, p. 94. RPICC data forms required by HRS gather a number of types of data, including demographic data and fiscal data. P. Ex. H., pp. 85-90. HRS requires participating hospitals individually to qualify patients for the program, and to maintain patient specific data. All of the data, which includes total charges by patient, is entered into a computer database accessible by HRS computer terminals. Id.; T. 41.

39. The data submitted on the forms required by the HRS manual are used by HRS for a variety of purposes. They are used to evaluate the effectiveness and adequacy of the RPICC program. They also may be used for research to evaluate the consequences of high risk birth and high risk care, to continue optimal perinatal care, and to establish, expand or revise medical technology and principles of care of such high risk patients. P. Ex. H, p. 85.

40. The level of services provided by a particular hospital is a basis for distribution by contract of the RPICC funds available in the *next* fiscal year. T. 40, 37.

41. Clinical data from the quarterly report, P. Ex. K, p. 190, are also used to determine and verify the NCG of patients. T. 32, 44.

42. All Children's Hospital keeps logs on all patients in its neonatal unit, which includes RPICC patients, as well as charity, Medicaid, private pay, and insured patients. T. 125. The log includes a number of types of patient specific data, including charges associated with all neonatal patients, clinical data, but not physician charges. T. 126.

43. All Children's Hospital does not send its log in that form to the HRS RPICC program. T. 125. The log is, however, maintained to prepare the cost report and to provide verification for the cost report which is sent to HRS. T. 130-31, 125. HRS has contracted with an outside agency to conduct audits of the hospital's cost reports, and the audit may include the patient specific records in the RPICC program. T. 130, 125.

44. The cost report submitted to HRS by a hospital at the end of the fiscal year is used by HRS to determine total costs for all perinatal patients, not just for RPICC patients. T. 131. The cost report is not used by HRS to make year end adjustments, or to "settle up" with the hospital. T. 65.

45. The Children's Medical Services Program Office of HRS uses the patient specific charge information and clinical information as reported in cost reports by RPICC programs throughout the state to establish the base rate. T. 126.

46. HRS also uses data from the log to calculate the cost of the program for all neonatal patients, not just for RPICC sponsored neonatal patients. T. 127. The information is used to determine outcomes, length of stay, and in a general sense, to evaluate the operation of the perinatal program in Florida. Id.

47. On a monthly basis, All Children's Hospital writes off RPICC program charges as "charity" care. T. 59. Income received under the RPICC program is ratably taken into income as received, and is not identified by All Children's Hospital as a payment to the account of, or with respect to, a specific patient. T. 59-60.

48. Neither the patient nor the participating hospital is entitled to payment on behalf of the specific RPICC patient. Instead, it is the hospital under contract with HRS which is entitled to RPICC grant funds, and such funds are paid to the hospital in a lump sum that does not identify specific component payments for specific RPICC patients. T. 127-28, 42. In contrast, payments for Medicaid patients are on a per diem basis and are patient-specific. Id.; T. 131. Patients eligible for the RPICC program and their parents or guardians may not be billed by the participating hospital. Bills are sent to Medicaid patients. T. 127-128.

49. Patients eligible for the RPICC program may be treated only in a hospital under contract with HRS to operate such a program and to receive RPICC grant funds. T. 126. Medicaid eligible patients can go to any hospital in the state. Id.

50. In summary, although All Children's Hospital is required by the HRS manual to collect and report to HRS a wide variety of information concerning the perinatal program, and although All Children's Hospital internally collects and records perinatal program information on logs, and although much of the information is patient and charge specific, none of these reports or records are submitted to HRS to justify payment for services rendered to a specific patient or as a bill for a specific patient. Moreover, there is no evidence that HRS uses any of this information to make patient specific payments.

51. Two experts, both certified public accountants, testified in the formal administrative hearing concerning the correct accounting classification of All Children's Hospital's fiscal year 1986 RPICC charges and grant receipts. The experts disagreed. T. 62-64, 87-91.

52. The expert witness who testified for the Hospital Cost Containment Board expressed the opinion that the RPICC differential should properly be classified under FHURS manual account 5940, "contractual adjustments-other." T. 88. His opinion was based primarily upon

204

similarities between the RPICC program and the Medicare and Medicaid programs, both of which are classified under account 5940. These similarities are: the requirement that a log of individual patient names and charges be maintained; an annual cost report; the requirement that the eligibility of patients be determined; payment based on resources used (costs and expenditures), and return of over payments in excess of resources used; and payment by a third-party agency. T. 88-89.

53. The Board's expert was of the opinion that since medical and financial eligibility for the RPICC program was determined on an individual basis, and since reports are based upon specific patients, the funds received from the RPICC program were not for the care of "non-specified" medically indigent patients. Thus, account 5970, "restricted donations and grants for indigent care" was, in his opinion, not a proper classification. T. 94-95. In his view, any government grant program for indigent care that requires reports identifying specific patient would be disqualified from classification in account 5970. T. 100. He expressly did not rely, however, upon the mode of payment for his interpretation of the word "specified." T. 95.

54. Petitioner's expert testified that the RPICC differential *might* be reported under FHURS manual account 5940, "contractual adjustments-other," and that there was no prohibition against placing charity care under that account. T. 66-68. (There are other programs reported as a "contractual adjustment-other" that do not have a year end adjustment by cost report. T. 89). It was his opinion, however, that the charges and funds received for these patients were *more* appropriately classified in accounts 5960 and 5970, as set forth in the corrected actual report of All Children's Hospital. T. 67-68.

55. It was the opinion of the Petitioner's expert that only the charges associated with RPICC patients should be reported in account 5960, "charity/uncompensated care-other" because the Petitioner does not receive any funds from the patient's parents, and the FHURS manual provides that only "amounts received from . . . government agencies on behalf of *specific* indigent patients" should be reported as an amount received. P. Ex. M., p. 254; T. 73. He expressed the opinion that the RPICC funds were not received on behalf of specific patients. T. 73-74.

56. The Petitioner's expert also admitted that because the RPICC grant amount might not actually be paid in full in a given fiscal year due to the monthly operation of line 5, the "entitlements" limitation, on the form at p. 193, P. Ex. K, the grant amount of the RPICC contrct might not be characterized as a lump sum. T. 75-76. He also

**205**

was of the opinion that considering fiscal year 1986 in isolation, since the full contract amount was paid, fiscal year 1986 involved a "lump-sum grant." T. 75-76.

57. Finally, even if the funds received were determined not to be a "lump-sum grant," the Petitioner's expert still was of the opinion that the RPICC charges should still be reported under account 5960 as "charity/uncompensated care-other." T. 76.

58. A primary objective of the reporting system established by the Hospital Cost Containment Board is uniformity of reporting. T. 119.

59. The Hospital Cost Containment Board takes the position that it has the authority and duty to review and verify all data submitted to it. T. 118, 123.

### Conclusions of Law

1. The Division of Administrative Hearings has jurisdiction of the subject matter and of the parties.

2. The request for formal administrative hearing was timely filed.

3. Section 12(5), Chapter 87-92, Laws of Florida, provides that:

A hospital may correct, *subject to verification* by the hospitals' [sic] *independent certified auditors,* its 1986 fiscal year data up until 90 days after the effective date of this act. *Based upon this corrected data,* the board [the Hospital Cost Containment Board] *shall* recalculate the distribution due under this act no later than October 15, 1987, and shall certify to the department [HRS] a revised formula by October 25, 1987. Amounts previously distributed may be distributed based upon this final determination. (E.S.)

4. All Children's Hospital argues that the Hospital Cost Containment Board must accept the corrected fiscal year 2986 data, once it has been verified by an independent certified auditor, and has no authority to reject the corrections to the fiscal year 1986 data. The argument is premised upon the phrase emphasized above that the Board *"shall"* recalculate the distribution due *"based upon this corrected data".*

5. Section 12(3), Chapter 87-92, Laws of Florida, provides that the redistribution of trust funds "shall be based upon the fiscal 1986 hospital data as reported to the board." Both parties in this case agree that "fiscal 1986 hospital data" means the hospital's report of "its actual audited experience" for the fiscal year as required by section 395.507(7), Fla. Stat. (1987).

6. The report of "actual audited experience" must be filed on forms adopted by the Hospital Cost Containment Board and must be "based

206

on the uniform system of financial reporting" established by the Board. Section 395.507(7), Fla. Stat. (1987).

7. The Board is also required by subsection (1) of the same statute to establish by rule a uniform system of financial reporting based upon "a uniform chart of accounts developed after considering" certain industry standards and "generally accepted accounting principles." The Hospital Cost Containment Board has adopted a number of procedural rules establishing the uniform system of financial reporting, and the system established includes the Florida Hospital Uniform Reporting System (FHURS) Manual. Section 395.507(1) further provides that:

> As a part of such uniform system of financial reporting, the board may require the filing of any information related to the cost . . . of any service provided in such hospital. . . . (E.S.)

8. Thus, the report of actual audited experience for the preceding fiscal year must be filed on forms adopted by the Board and must comply with the uniform system of financial reporting which, by statute, the Board was required to establish by rule.

9. While section 12(3) of Chapter 87-92, Laws of Florida, does not explicitly state that the correction to 1986 fiscal year data must be reported pursuant to the uniform financial reporting system established by the Board, that surely must have been the intent of the Legislature. It would be unreasonable to infer that the Legislature intended that such corrective reports might be filed without uniformity, given the mandate of section 395.507(1), Fla. Stat. (1987) that reporting be uniform. This is especially true given the purpose of section 12 of Chapter 87-92: that the Public Medical Assistance Trust Fund was established to provide "equity among hospitals," and the redistribution was "needed in order to accomplish the original intent." Section 12(1), Chapter 87-92, Laws of Florida.

10. Thus, it is concluded that the corrective report must be filed pursuant to the uniform financial reporting system established by the Board.

11. Does, then, the Board have authority to disapprove a corrective report for failing to comply with the uniform accounting system? Since the Board is required to establish the system of uniformity, and since equity is to be done among the hospitals in the redistribution of trust funds, then the answer surely is yes. Verification by an independent auditor is a step toward uniformity, but independent auditors, in good faith, can be expected to reach differing accounting conclusions at least some of the time. The experts in this case disagreed. Finding of fact 51. Neither uniformity nor equity can be expected or will be achieved if

**207**

the final accounting in the various corrected reports depends solely upon the various opinions of different auditors.

12. An express grant of power to an agency includes, by implication, such powers as are necessarily or reasonably incident to the powers expressed. *Hall v. Career Service Commission*, 478 So.2d 1111, 1112 (Fla. 1st DCA 1985). Implicit in the requirement that the Board establish a uniform financial reporting system is that there be power in a single entity, the Board, to reject reports that are not uniform.

13. Therefore, it is concluded that the Hospital Cost Containment Board has authority to disapprove a corrective report for noncompliance with the uniform accounting system.

14. Section 12 of Chapter 87-92, Laws of Florida was enacted to redistribute funds in the Public Medical Assistance Trust Fund.

15. The distribution formula enacted by the Legislature is based upon the "uncompensated care" of a hospital. Section 12(3)(b), Chapter 87-92, Laws of Florida.

16. "Uncompensated care" is defined as "the sum of *charity care* and bad debts." (E.S.) Section 12(2)(k), Chapter 87-92, Laws of Florida.

17. "Charity care" is then defined by section 12(2)(e), Chapter 87-92, Laws of Florida, as follows:

. . . [T]hat portion of hospital charges for care provided to a patient whose family income for the 12 months preceding the determination is below 150 percent of the federal nonfarm poverty level unless the amount of hospital charges due from the patient exceeds 25 percent of the annual family income, and for which there is no compensation. Charity care shall *not nclude* administrative or courtesy discounts, contractual allowances to third-party payers, or *failure of a hospital to collect full charges due to partial payment by government programs.* (E.S.)

18. The RPICC program is a government program. It is created and funded by the Legislature of the State of Florida. Sections 383.15 through 383.212, Fla. Stat. (1987).

19. The amount of RPICC funds distributed to hospitals that participate in the RPICc program usually results in only partial payment of the full charges for the RPICC services rendered by those hospitals. Findings of fact 10 and 11.

20. In fiscal year 1986, All Children's Hospital did not collect full charges for RPICC patients. Findings of fact 10. Is this a *"failure"* to collect full charges "due to partial payment by government programs?

208

Hospitals which participate in the RPICC program are forbidden by statute from charging parents or guardians of financially eligible patients served by the program. Section 383.18, Fla. Stat. (1987). See also finding of fact 29. A "failure" is defined as "a falling short; deficiency . . . " *Webster's New Twentieth Century Dictionary,* 2nd Ed. (Unabridged). Thus, the word "failure" does not necessarily connote the preexistence of a duty to succeed. It follows, then that the "falling short" of collection of full charges for RPICC patients is a "failure" to collect such charges, notwithstanding the impossibility of collection and the lack of a duty to collect from patients or patients' guardians.

21. But is the "failure" *"due"* to partial payment by government programs?" The failure of hospitals which participate in the RPICC program to collect full charges for services rendered to RPICC patients is not a failure due to the lack of diligence on the part of the hospitals. It *might* have been a failure due to the lack of resources of the patients or those responsible for the care of the patients, since indigency is a requirement for eligibility; but *that* cause of failure to collect full charges will never been known since the statute forbids any activity (notably, it forbids the billing of those patients) which would result in ascertainment of that cause of failure to receive full payment.

22. The cause of the failure to collect full charges is due to the way in which the payment system of the program itself is established by statute. The program statutorily forbids any efforts to charge parents or guardians any additional amount. Thus, the "failure of [the] hospital to collect full charges" is *only* "due to partial payment by [a] government program."

23. The words "due to partial payment by government programs" should be given a plain meaning. "Partial payment" undoubtedly means "partial payment of specific charges to specific patients," but there is no logical reason to restrict the meaning to only such governmental programs that itemize payments by patient. The RPICC funds received in fiscal year 1986 by All Children's Hospital from HRS were clearly "payments" due under the contracts. P. Exs. K and L. The "payments" were partial, as the parties to the contracts were well aware, because All Children's Hospital kept a record of full charges by patient, and the "payments" were less than the total of such full charges. Findings of fact 8-10, 42-45.

24. Consequently, the difference in this case between the amounts received by All Children's Hospital from the RPICC grant funds, and the full charges of All Children's Hospital for services rendered to

209

RPICC patients in fiscal year 1986 is not "charity care" as defined by section 12(2)(e), Chapter 87-92, Laws of Florida, and should not be counted as "uncompensated care" in the distribution of Public Medical Assistance Trust Funds pursuant to section 12(e)(b), Chapter 87-92, Laws of Florida. There is no need to look to FHURS manual definitions of "charity care" since the issue is determined by the statute.

25. While it is not essential that this case be decided upon the FHURS manual definitions, those issues were litigated by the parties. Thus, this recommended order will address all remaining issues.

26. The differential between the receipts and charges for services rendered to RPICC program patients may properly be classified under FHURS account 5940, "contractual adjustments-other." Finding of fact 54. See also finding of fact 52. The only real dispute is whether the differential would *better* be classified in accounts 5960 and 5970 as proposed by the Petitioner.

27. With respect to the opinion of the Board's expert, the assumed similarities to the Medicaid program (see finding of fact 52) were shown by the evidence to be questionable. It is true that the RPICC program and the Medicaid program both have cost reports, but in contrast to the Medicaid cost report, the RPICC cost report is not used by the government payer for end of fiscal year payment adjustments. Finding of fact 44. It is true that payment in both programs is based on resources used, but the Medicaid payment is based on resources used by a specific patient and is a patient-specific per diem payment. The determination of resources used, and payment therefor, it not patient specific in the RPICC program, but is made in the aggregate. Findings of fact 48, 50, 33-37. It is true that both programs require a log of individual patient names and charges, but the Medicaid program pays on a patient specific basis. The RPICC program does not. It is true that both programs require individual eligibility determinations of medical indigency, and both programs involve payment by a third-party agency, but *any* government program for indigent care would have those characteristics. If this were a good reason to classify the differential only in account 5940, then account 5960 would be superfluous.

28. The most persuasive reason for the conclusion that the differential between charges and receipts in the RPICC program more appropriately fits the classification of FHURS account 5960, "charity/uncompensated care-other" is that this account, unlike account 5940, expressly requires that there have been a "verifiable process" to

210

determine medical indigency on an individual basis, and uses the same definition of indigency as used by the RPICC program.

29. But this appears to be the only reason. Close analysis of the way in which the description of account 5960 is structured leads to the conclusion that account 5960 is limited to a circumstance where individual patients are individually presented bills but fail to pay.

30. This conclusion admittedly has an apparently illogical aspect. Account 5960 plainly requires that "charity/uncompensated care-other" patients be identified in advance, with individual ascertainment of indigency. Once a hospital has verified in advance that the patient is *indigent,* it seems unreasonable to expect or require that the hospital then *bill* the patient, or to expect any amount to be "recoverable" from the patient. There may be a reason for this facial illogic, but there is no evidence in the record on the point.

31. Despite this apparent illogic, this case must be decided upon the record presented and, more particularly, upon the FHURS definitions of the accounts. And that is the way the FHURS definitions read.

32. The last paragraph of account 5940, "contractual adjustments-other," provides:

> *In any instance* in which the difference between the amount of a patients' [sic] *bill* and the payment received by the hospital from a third-party agency *is recoverable from the patient,* any resulting uncollected amounts should be reported in the appropriate bad debt *or uncompensated care* category and should not be reported in contractual adjustments. (E.S.)

This paragraph unavoidably implies that the "uncompensated care" account is used in those cases where the difference between a *"bill"* and the amount received from a third-party agency "is *recoverable from the patient."*

33. One then must turn to the description of account 5960, "charity/uncompensted care-other." Account 5960 is by FHURS definition premised upon "the amount, based on the hospital's full established rates, of *bills* for hospital services to charity/uncompensated care patients." Does the FHURS manual intend the common meaning of a "bill," i.e., the sort of thing one routinely receives in the mail? There is no direct evidence on this point, and none of the expert witnesses expressed an opinion on this issue. Absent evidence in the record of technical accounting meaning for the word, the common meaning ought to be applied.

34. The dictionary indicates that a "bill" has many meanings, but in

a commercial context, is defined in part as "an *account* of . . . services rendered, or work done, with the price or value noted . . . ; a statement of money *due.*" (E.S.) *Webster's New Twentieth Century Dictionary,* 2nd Ed. (Unabridged). Thus, despite the common understanding that a bill is something you receive in the mail from a creditor, the word "bill" more broadly means the *account* of services rendered *and* the amount *due,* and does not require delivery to be a "bill."

35. Nonetheless, a "bill" is commonly defined in a commercial context as a statement of money *due.* Thus, it would appear that account 5960 is limited to amounts *"due"* from patients ("amount . . . of bills") based upon full established rates.

36. On the "amounts received" side of the ledger, the FHURS account 5960 appears to be limited to a circumstance where the hospital receives amounts as *specific* payments for *individual* patient's bills. Initially, the language of the description is broad enough to include amounts received as a lump sum payment. The description is of "amounts to be received from patients *or on behalf of patients (including amounts received from . . . government agencies on behalf of specific indigent patients)."* An amount could be received in lump sum and still be an amount received "on behalf of patients," even though it represented an aggregate payment for services rendered to many patients.

37. But the third paragraph of the FHURS manual description of account 5960 states:

> *When* the hospital receives *lump-sum grants* or subsidies *(rather than specific payments* for *individual* patient's bills) from governmental or voluntary agencies for the care of medically indigent patients, the amount of the lump-sum grant or subsidy must be reported under "Restricted Donations and Grants for Indigent Care." (Account 5970). (E.S.)

There would be no need for this paragraph to mention lump-sum amounts if the previous description of account 5960 had embraced amounts received in lump-sum. Moreover, the parenthetical quoted above clarifies the first paragraph of the description of account 5960. The reference "rather than" in the parenthetical must have reference to something preceding, and that something must be not only the immediately preceding phrase in the sentence, "lump sum grants or subsidies," but also the initial description of the account, which used the word "bills" and included "amounts received from . . . government agencies on behalf of *specific* indigent patients."

212

38. In summary, with respect to charges, by its own internal definitions, FHURS account 5960 is limited to charges which are in fact due from individual patients. With respect to receipts, FHURS account 5960 is limited by its own wording to amounts received from governmental agencies as specified payments for specific patients, and does not include amounts received in lump sum for a group of patients.

39. Finally, it is noted that the FHURS description of account 5960 explicitly states that "[c]ontractual adjustments should not be reported in this account." As discussed above, the record in this case supports the conclusion that at least in a general sense, the RPICC differential between charges and amounts received is properly placed in the "contractual adjustments-other" account.

40. There is no "bill" with respect to specific RPICC patients. There is no money "due" from parents or guardians of patients in the RPICC program, and there is no "payment . . . recoverable from the patient." Pursuant to section 383.318, Fla. Stat. (1987), such persons "shall not be additionally charged for treatment and care which has been contracted for" in the RPICC program by HRS.

41. Thus, for the reasons set forth above, the charges in the RPICC program are not properly classified under account 5960.

42. Amounts received in the RPICC program are not specific payments by a governmental agency for specific patients. See findings of fact 27-50. Thus, the amounts received in the RPICC program are not properly classified under account 5960.

43. In conclusion, the differential between charges and receipts for RPICC patients should be reported as a "contractual adjustment-other," FHURS account 5940, and not as "charity/uncompensated care-other," FHURS account 5960.

44. The formula for distribution of Public Medical Assistance Trust Fund money depends upon a determination of the number of "uncompensated care days" in fiscal year 1986. That figure depends upon a calculation of "charity care," which is defined as a differential: charges for which there is no compensation. Since the *differential* should be reported as a "contractual adjustment-other," there should be no reason to decide the final question: that is, whether the money received from HRS in the RPICC program is properly classified in FHURS account 5970, "restricted donations and grants for indigent care."

45. Nonetheless, if it were determined that the charges for the RPICC program should be reported in account 5960, then the last question would require resolution.

213

46. The RPICC funds are grants. Finding of fact 27. These funds are still "grants" even though the amount received in a particular fiscal year might be less than the maximum stated price. Moreover, payments under the RPICC program are not for the bills of specific patients, and the third paragraph of the description of account 5960 seems to point to account 5970 as the proper account for reporting such receipts.

47. THus, the only real issue is whether RPICC payments are for "non-specified medically indigent patients." The Board's argument that such patients are "specified" because the hospital knows who they are and keeps a record of such identities is not persuasive: one would hope that every hospital knows the identity of its patients. Similarly, though charges for RPICC patients are identified by individual patient, HRS does not pay on the basis of individual or specified patients. Nor is it of much use to note that all RPICC patients are medically indigent. Account 5970 is by its terms is limited to patients of that type, so the designation "medically indigent" could not be what the account means by a "specified" patient. Government "grants" always have record keeping requirements. It is inferred that a governmental "grant" that is "restricted" for the care of medically indigent patients would always require that patients be screened for eligibility, and that the hospital keep records of patient identity and charges. Were these good reasons for the inapplicability of account 5970, that account would never be used. Finally, the fact that RPICC funds are limited to a particular type of health problem does not mean necessarily that the patients are "specified." It only means that the illness is specified.

48. On the other hand, RPICC patients are not specified in one sense because the hospital has to accept all patients needing care who qualify.

49. But the most persuasive reason to conclude that RPICC patients are "non-specified" is to return to the third paragraph of the description of account 5960. That paragraph does not use the term "non-specified medically indigent patients." Instead, it gives the negative example: "rather than specific payments for individual patient's bills." It must be concluded from this that a "specified" patient is a patient for whom there is a "specific payment" for that patient's "bill."

50. RPICC patients do not get bills, and the government grant does not pay specific charges by individual patient. Thus, RPICC patients are "non-specified" as that term is intended by account 5970.

51. It then follows that if the charges in the RPICC program were properly classified in account 5960, then amounts received from the RPICC grant program are amounts received for the care of non-

specified medically indigent patients, and should be reported under account 5970.

52. Since the differential between charges and receipts for the RPICC program at All Children's Hospital in fiscal year 1986 should be reported as a "contractual adjustment-other," FHURS account 5940, the corrected report of the Petitioner is improper and should be rejected by the Hospital Cost Containment Board.

53. Consequently, there should not be an adjustment as to the amount of redistribution due All Children's Hospital.

54. As discussed above, the conclusions of law in this recommended order are based upon an attempt strictly to follow the definitions of "charity care" provided by the legislature and the Hospital Cost Containment Board. The result, particularly with respect to the FHURS manual definitions, has inherent problems of reasonableness. Nonetheless, it is preferable to apply language as it is written. The alternative, to venture into the unkown without a record basis for guidance simply to avoid an absurd result, would be unwise.

55. In any event, the Hearing Officer has come away from this case with the firm conclusion that a clear and detailed definition of charity care is seriously needed. The problem of charity care cannot be solved until someone defines it.

## Recommendation

For these reasons, it is recommended that the Hospital Cost Containment Board enter its final order denying the proposed correction to All Children's Hospital's report of actual audited experience for fiscal year 1986, and denying the proposed adjustment to the redistribution to All Children's Hospital from the Public Medical Assistance Trust Fund.

DONE and ENTERED this 17th day of February, 1988.